Good morning. Good morning, Your Honors. May it please the Court, Michael Tanaka appearing on behalf of Ms. Garcia, and I'll try to reserve one minute for rebuttal. In this case, Ms. Garcia was convicted of first-degree murder and the financial gain circumstance was found true. As a consequence, she's serving life. She's an LWAT person, right? She's an LWAT. Yeah. So it's undisputed that she shot him. The question, though, is was this totally premeditated? Apparently, they had cameras. They had cameras because the victim was indisputably paranoid and had cameras in every room, steel shutters. Does it say just because you're paranoid, what does it mean that you're wrong? No, it just means someone's following you that they're not. Yeah, that's the old saying, even a broken clock is right twice a day. Let's just jump right to it. I know you're experienced in criminal law and that, so on the first prong of Strickland, can you point to any Supreme Court precedent recognizing that the conflict of interest asserted by Ms. Garcia here is a valid basis for an ineffective assistance of counsel? Because you're under AEDPA, right? That's correct. This is kind of a different ineffective assistance of counsel. Well, I mean, it's clear the Supreme Court has laid out a general principle that conflicts of interest violate the Sixth Amendment and violate Strickland. Now, there's some of those that you don't have to find prejudice for. I can see this is not one of them, but nonetheless, the general principle is that where there's a conflict of interest, subject to the Sixth Amendment, and could be a violation. But you don't have a specific case on... There's not a specific case that says... My understanding, just so I understand this, is that, okay, because she shoots the deceased, but he doesn't die right away, and he dies in a month, and then your client apparently wanted to have private counsel contacted someone, and so not having any money said, well, I have... I can get money from this trust, and so the lawyer said, well, I'd like to get paid before I accept your case, because otherwise she would get the public defender, which she ultimately ended up with the public defender, right? Respectfully, Your Honor, no, actually, he was retained the entire way. Pardon? Did that attorney ask for anything else other than, hey, I'd like to get paid out of the trust? She... I think the evidence in the record is that he got $5,000 retainer from her immediately, and that wasn't from the trust, because she actually didn't get any money from the trust, and that was for the criminal case. So then... Your case would be better if the attorney had called and said... if the represent you, and I'll take it on a contingency, because I know if I get you off, maybe then you can get access to all this money, but it's not that type of situation. He didn't... the lawyer didn't say that to the... No, I'm not suggesting that the conflict was him taking both the criminal case and the case with the trust necessarily. The conflict occurred when, because he did that, then he made demands on the trust that she'd never authorized. She may... it's not clear whether she was aware of them, but she certainly didn't authorize the demand for anything other than on Mr. Zwieg's behalf. So that changes dramatically the whole mode of evidence with respect to the trust. That is, if she's just making inquiries to the trust for him, then it doesn't suggest that she killed him because she wanted the trust money. On the other hand, as the prosecution argued, if the reason she killed him was because she wanted that substantial trust money for herself, and the lawyer's immediate demands to turn over all this money to her certainly plays into that theory on the prosecution's behalf, that's a whole different case. So what the conflict was, is that because this man was doing both, he was disabled from saying no, you know. Honestly, I went and got that because I wanted to get paid. She never asked me to do that. I may have suggested that to her, but she said she did not do that, and that's the only evidence in the record on this issue. Let me ask you a quick question, because you can refresh me on this. During the did that come into evidence? Yes, that was a big part of the prosecution's case. They had the trustee on the stand, and they specifically asked, was there a demand? And he said yes, and they went through what the demand was, and then in closing argument, the prosecutor said, look, this proves motive. This shows that's why she shot this man. It's because she wanted that money. The fact is, she never got a penny. But wasn't there a lot of other evidence to support the financial motive, the fact that she had corrected a misspelling in the trust document, so she was aware that she was going to benefit, the fact that she threatened to take him down in a way that he's never been taken down before. So there's more than just that one piece of evidence. No, undoubtedly, and I don't seek that, and we're not arguing that the evidence is insufficient on that ground. It's just that, in the context of this case, all those kinds of things, you know, they sound bad on paper, but this was a very volatile relationship. They were threatening each other all the time. It all goes to the prejudice inquiry. Let me ask you this, because it seems like in your reply brief, you did concede that this is not a Mickens presumed prejudice situation. So we do analyze the prong under Strickland. Is that your position? Yes, yes. So looking at the prejudice prong, that's why you raised the evidence of the other financial motive evidence that the prosecution relied on. Your case would be a lot more compelling if the only evidence the prosecution relied on was the fact that the attorney who represented her at the criminal trial was the one who the trust. But that wasn't the situation, right? Well, with respect to the trust, the only evidence connecting her personally to requests on it was one, the undisputed request while he was still alive for funds from the trust to pay his medical expenses, and then a second one shortly after he died, which she said was for his funeral expenses, and there's nothing that suggests that isn't true. The fact that immediately after his death, she had an attorney, this is the prosecution's theory, right? You killed him because you had a financial motive, and as evidence for that, shortly after he passed away, you had an attorney immediately reach out for trust funds to be disbursed. And so that's your... The timing is not quite that. Shortly after he died, she asked personally to contact the trust for money for his funeral expenses on her and on his behalf, not hers. I understand that. I'm talking about the prosecution theory, right? I don't know if it was after his death or during the time that he was hospitalized. She had contacted the trust attorney or administrator in order to get a disbursement to pay for his hospital expenses, but that's not my point. No, that was her. That wasn't him. That wasn't the attorney. Let's slow down. Okay. That's what I said, that she had reached out in an attempt to, what she said, secure some disbursements in order to help pay for his expenses. Then an attorney reached out in order to have the funds disbursed, and her theory of the conflict or your theory of the conflict is that the attorney was compromised. His representation was compromised because she never authorized him to reach out in the first place. So he shouldn't have been the trial counsel to take her case to trial because he couldn't vigorously defend the financial motive. Am I right so far? That's correct. Yes. So that's your theory. But that theory would be a lot more compelling if that was the only evidence of financial motive that the prosecution relied on. But in this case, as I see from the record, there was ample other evidence to demonstrate that she had financial motive, namely the fact that she knew she was beneficiary, the fact that during the argument that they had shortly before she shot him, she demanded $15,000 to move out, the fact that she threatened to take him down like he's never been taken down before. So in light of all the other I don't dispute that there was other evidence, but I think that's qualitatively different and that takes on a different lens. If you look at it from, if you're looking at the notion that look, she's after this trust money and then all that makes sense. She's a greedy, greedy person who will kill to get money. But absent that piece, absent that piece that we know there's a trust out there, we know that she demanded money from him and they had all kinds of problems. It doesn't tie it all together in the same way. That evidence that you just pointed to doesn't have the same impact and significance because it's not all a part of this larger narrative that's tied right at the end by, okay, give me all that money from the trust. And that, as I said in my brief, is the linchpin of the prosecution's case. That's what puts all of this into context and that's why all that is so damaging other than just facts that are out there that are troubling, but not necessarily. I think we've taken over, so I'm going to go to the other side. At the conclusion of the other side, if any of the panel members want to ask you additional questions, I'll consider giving you a minute of rebuttal. Thank you, Your Honor. Thank you, Mr. Tanaka. May it please the Court, Deputy Attorney General Michael Katz for respondent. The State Court of Appeal reasonably rejected this claim under Strickland v. Washington. Regarding the first prong of Strickland, the performance prong, the district court made a factual finding that the trust attorney, I'm sorry, Mr. Wasserman, the trial attorney, when he made the demand to the trust attorney, he did not do it out of his own self-interest. Rather, Mr. Wasserman did it with petitioner's knowledge. That's what the district court said at pages 94 to 95 of the first volume of the excerpts of record. Let me ask you this, Mr. Katz, right away. Was this fact ever brought out during the he was doing it on her behalf to get, for his own behalf, essentially to get funds? Did that ever come out? It did not, Your Honor. So that leaves us with the only evidence being that, and that may not be sufficient, but there it is, that there was this demand made on the trust for money for her behalf, and that's what the fact finder heard. That's what the fact finder heard, Your Honor, but we're referring to the district court. The district court reviewed the state court record, which included the state court appellate record, which that also included the new trial hearing in the trial court after the verdict, and that included Mr. Wasserman's declaration under oath, and although petitioner says in his reply brief that this is a cold record and that's true, and he questions whether the clear error standard applies in a cold record, this court has said that it does. In 2015, this court said that, and if it would be helpful to file something on a brief with the authority, I could do so. I told my opponent by email what the citation was, but the reasoning in 2015, the Ninth Circuit, was this. We don't base the clear error standard only on the district court's ability to judge credibility. We also base it on traditional resources, and it would be an enormous waste of resources to duplicate factual findings in the appellate court for very little benefit. So the clear error standard applies. I understand your point, Judge Ezra. It's true that this point did not come up during the trial, but it came up after the trial in the state trial court, in the state appellate court, in the federal district court, and that's subject to clear error in this court. So given that and given the findings that the state appellate court made on the second direct appeal, the petitioner cannot get past the first problem. Well, I think your opposing counsel, essentially his main point is that if Mr. Wasserman wasn't the lawyer, and let's say we had a very competent lawyer such as yourself defending the defendant, and you would have called Mr. Wasserman for sure to say, look, didn't you make this demand for the benefit of paying attorney's fees? That would depend on the answer, Your Honor. So if the answer was, I made the demand because I spoke with a petitioner and I did it for her benefit, which is the gist, although it's not the literal statement in his declaration, that's the gist of it, and it's the finding that the district court made here, then I wouldn't ask the question. Well, but the idea, if someone kills someone to preserve the trust assets, it certainly isn't to preserve the trust assets. You're going in circles here. It isn't to preserve the trust assets so that it can pay for your attorney's fees for killing him. You see? I do see, but that's not, but I think it's a distraction to say it was for the attorney's fees. If it were for the attorney's fees, then we could deal with whether that satisfied the Strickland testament, does not, but just factually, it's just not true in this case. There's no evidence that that's what happened. What we have is Mr. Wasserman's declaration strongly implying that's not what happened. Well, let me ask you this, because I have some questions on, I think we know what your argument is on that, but in your view, can this case be resolved on either prong of Strickland, and on which prong would it be better for us to base our decision? Because it looks to me like you possibly concede that the Court of Appeals discussion of prejudice does not precisely track the correct standard under Strickland, and so I would just like your views on all of that. Thank you, Your Honor. Really, we are not conceding that, but just to get to the first part of your question, I think you should go to the second prong. I think that that's the easiest way to dispose of this case, and here is the evidence. But a better case on the prejudice prong. I think that's right. I think it's winnable on both prongs, but I think that the better one is the prejudice prong, and part of it is what you mentioned, Your Honor, that when, to my opposing counsel, there was a mountain of evidence, not your turn but mine, I think. But here's the evidence that goes to the prejudice prong. We have Petitioner living with Mr. Zweig, knowing that Mr. Lanuti is coming to present the trust to Mr. Zweig. We have Petitioner leaving the room and then coming back later, and when Mr. Lanuti leaves, she calls him and says, you misspelled Mr. Zweig's name. Then at trial, Petitioner admits under oath that she knew that she was the beneficiary of the trust and it involved a lot of money. Shortly before she shoots and kills him, I would say within the same month, I think, she threatens to take him down as he's never been taken down before. That's an audio tape, and this Court has a transcript of that threat. Then she calls Mr. Lanuti twice. The first time, she calls him to say that she wants to handle Mr. Zweig's medical expenses through the trust. The second time, according to Mr. Lanuti's declaration that this Court has, she called about her rights under the trust. He doesn't say she called for Mr. Zweig's funeral expenses. Petitioner says that, but this is the same person who said I shot in self-defense when the video totally contradicts that. Mr. Lanuti, who has no motive to lie for either party, said she called me about her rights under the trust. So when you consider all that happens together, and the state standard is not that that was her sole motive to kill, but that she killed with the expectation that she would get that money, it's impossible to see really how she could prove the prejudice problem. Well, she also, and I'm not sure how the timeline fits in exactly here. Apparently, the deceased, with good reason, thought that his life was in jeopardy and told someone to that effect and remove what he thought were all the guns from the house. And then somehow there was another gun somewhere, and I don't know exactly how that came about. So were there any contacts with the trust while that was going on? Well, let's see. I believe that happened the day before she killed him. And what happened was with the guns being taken away, and I think that what happened was the petitioner's sons, either she or her sons called the police and said, I think Mr. Zweig is trying to call petitioner, trying to kill petitioner. So the police came, or maybe not trying to kill him, but trying to kill her, but a danger to her. And then he was allegedly drunk. And the police came and they said, he doesn't seem drunk to us, and it's illegal for us to take his guns away. But then one of the officers told Mr. Zweig, you know, my advice to you is you should probably get rid of the guns. And he said, I'll take your advice. And he got rid of all the guns but one which fell on the floor, according to the videotape that the police reviewed after he died. And they don't know whether there were other guns that weren't captured on videotape. So the video of the killing shows the petitioner had a gun in the bedroom, hid it under a pillow, and shot him in cold blood while he was changing the trash can in the kitchen. I don't think, as chilling as that is, that it has to do with, those are factors that have to do with the current claim. Well, I think my recollection is, and Judge Wynn pointed this out, and I think this also goes to the prejudice prong, was that they had this horrific argument. And he put a note on the counter, and the note was basically an eviction notice. And then she went to him and said, look, if you want me to move out, I want $15,000. He tells her, forget it. And then the shooting occurs in very close proximity to those events, if I'm correct. You're correct, Your Honor. She wanted, he offered her $5,000. And she said, $15,000 is what I need, or I'm going to take you down like you've never been taken down before. And I believe that happened in October, and this killing happened in October. Right. All right. Your time has expired. Thank you, Your Honor. Thank you. Does anyone have any additional questions of Mr. Tanaka? All right. Then this matter will stand submitted. Thank you both for your argument.
judges: Callahan, Nguyen, Ezra